IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

The Andersons, Inc.,                                            Case No. 3:08CV809

          Plaintiff

    v.                                                            ORDER

Demrex Industrial Services, Group, LLC, et al.,

          Defendants

This is a contract case in which plaintiff, The Andersons, Inc., brings a claim for breach of

contract against Demrex, Inc. and its CEO Barry Portnoy. Jurisdiction exists under 28 U.S.C. §

1332.

Pending is defendants' motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil

Procedure for lack of personal jurisdiction [Doc. 7]. For the reasons discussed below, defendants'

motion shall be denied.

**BACKGROUND**

Andersons is an Ohio corporation with its principal place of business in Maumee, Ohio. It

purchases, leases and sells railcars. Once its cars age past financially-wise repair, Andersons sells

them to demolition companies for removal. It seeks bids from demolition companies to determine

1

which will perform this work. Rashesh Shah is President of Andersons' Rail Group and has been in this position for about ten years.

Demrex is a Pennsylvania corporation with its principal place of business in South Hampton, Pennsylvania. Jason Goldberg and the individual defendant Barry Portnoy jointly formed Demrex in September, 2007, with Portnoy and Goldberg serving as the company's CEO and President, respectively. Demrex is a full service demolition and environmental recovery corporation engaged in scrap recycling.

Two other corporations are relevant to the case's factual background, although neither is party to this action. Metals Management, Incorporated [MMI], based in Newark, New Jersey, is a consumer of ferrous and non-ferrous metals. Red Rock, Inc. [Red Rock] is a Pennsylvania-based demolition company previously ran by Jason Goldberg. Red Rock filed for Chapter Seven bankruptcy in 2007.

Red Rock contracted with Andersons to purchase 164 scrapable railcars located in Milo, Maine. In July, 2007, Goldberg concluded that Red Rock would likely be unable to buy the cars due to its financial circumstances. He phoned Shah and notified him of Red Rock's financial instability. Goldberg also told Shah about Demrex, which had been newly formed, and suggested that Demrex could take over the contract.

Following this telephone call, Portnoy and Shah began to negotiate a contract for Demrex to buy the 164 railcars. Their negotiations occurred by telephone and email with Shah located in Ohio and Portnoy in Pennsylvania. [1]

---

[1] Each party contends that the other made the first contact with the other.

The parties ultimately negotiated a contract for Demrex to acquire and scrap the railcars. As Demrex demolished the cars and sold the scrap to a third party purchaser, it would pay the purchase price to Andersons. Those payments were to be by wire transfer to Andersons' account with a Chicago bank. Demrex was to report weekly on the number of scrapped railcars and the amount of scrap shipped to the ultimate purchaser, MMI, in New Jersey.

As initially negotiated, the contract did not include either a personal guarantee or an advance payment. Andersons drafted the agreement, and sent it on or about September 21, 2007, to Goldberg, who signed it on September 26, 2007.

Even after the parties signed the contract, negotiations continued. Demrex started to question the financial viability of shipping metal by rail from Maine to New Jersey and began searching for a metal consumer to replace MMI. Andersons was concerned about Demrex's financial stability and desired to ensure its payment.

On September 18, 2007, before finalizing the first contract, Portnoy sent Shah an email asking for a lunch meeting. Portnoy claims that he intended this meeting to be a social "meet-and-greet," an opportunity to meet his client without discussing business. On September 28, 2007, the parties met for approximately one hour in Maumee, Ohio. Portnoy contends that he and Goldberg visited Shah on this date because they were in Pittsburgh, Pennsylvania, and thus fairly close to Maumee, on other business.

Although Shah, Portnoy and Goldberg opened the meeting with small talk, they soon started to talk about their concerns with the contract. According to Goldberg, the parties discussed the method of transporting scrap from Maine. At some point, Shah requested the presence of his company's assistant general counsel, Elizabeth Hall. Hall and Portnoy testified that they discussed

3

Demrex providing adequate security to support the contract. As such, Demrex would complete a commercial credit application and Portnoy would personally guarantee the contract. Portnoy had to provide Demrex with a personal financial statement.

Following this meeting, the parties continued negotiating by telephone and email. Portnoy sent a Revised Letter of Understanding dated October 5, 2007, to Shah, who executed it on October 8, 2007. This letter stated: "As per our meeting, the following are the terms in which we discussed." [Defendants' Exhibit 5].

This Letter modified the original contract by requiring Portnoy to personally guarantee the contract, submit Demrex to a commercial credit check and pay Andersons $100,000 up front. The Letter also authorized Demrex to use the scrap metal dealer of its choice and transport its scrap by truck.

Demrex submitted a bid to purchase an additional 78 railcars from Andersons, but Andersons did not accept that offer.

Demrex did not fulfill the contract. Andersons brought this suit to recover the unpaid purchase price.

Andersons filed this lawsuit on February 29, 2008 in the Lucas County, Ohio, Court of Common Pleas. Defendants removed the case to this court and then filed their motion to dismiss for lack of personal jurisdiction.

I held an evidentiary hearing on December 2, 2008, to provide me with sufficient facts to rule on this motion.

## STANDARD OF REVIEW

"The procedural scheme which guides the district court in disposing of Rule 12(b)(2) motions is well-settled." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991). The court decides jurisdictional disputes before proceeding to trial, *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980), relying on one of three procedural alternatives to make this determination. *Theunissen, supra*, 935 F.2d at 1458. It may: 1) "decide the motion upon the affidavits alone"; 2) "permit discovery in aid of deciding the motion"; or 3) "conduct an evidentiary hearing to resolve any apparent factual questions." *Id.*

The plaintiff's burden varies based on the court's chosen method. *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996); *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir.1989). If, whereas here, the court orders a pretrial evidentiary hearing, then the "plaintiff must show by a preponderance of the evidence that jurisdiction exists." *Welsh*, *supra*, 631 F.2d at 439.

## DISCUSSION

"In determining whether personal jurisdiction exists over a nonresident defendant in a diversity case, a district court applies the law of the state in which it sits subject to due process limitations." *Welsh*, *supra*, 631 F.2d at 439. In Ohio, personal jurisdiction exists only if the asserted jurisdiction: 1) comports with the state's long-arm statute; and 2) does not violate the due process requirements of the United States Constitution. *Serras*, *supra*, 875 F.2d at 1214.

### A. The Ohio Long-Arm Statute

Under the Ohio long-arm statute, O.R.C. § 2307.382(A)(1), personal jurisdiction arises, *inter alia,* from transacting any business in this state. The Ohio Supreme Court has broadly interpreted

the phrase "transacting any business." *Goldstein v. Christiansen,* 70 Ohio St.3d 232, 236 (1994) (finding the term "transaction" as used in "transacting any business" to encompass the actions of "carry[ing] on business" and "hav[ing] dealings") (internal citations omitted). Despite this broad interpretation, the court cautioned against rendering generalized statements of law in lieu of proceeding on a case-by-case basis. *Id.*

I find that sufficient contacts arose between Andersons and Demrex to bring Demrex and Portnoy within Ohio's long-arm statute. Though the parties dispute who contacted whom first, the relationship began when Goldberg, then still with Red Rock, told Shah about Demrex, and suggested that it could take over the contract to purchase the railcars. Doing so, he saw to it that the baton would be passed from Red Rock to Demrex, in which he was involved as a principal. *See Ricker v. Fraza/Forklifts of Detroit,* 160 Ohio App.3d 634, 640 (2005) (holding that although not determinative, the question of who initiated the business dealings is a factor to be assessed).

Crucial negotiations thereafter occurred in Maumee at Portnoy's request. Though he claims that he traveled to Maumee, located about 250 miles from Pittsburgh, simply to "meet and greet," I find that his purpose was to finalize negotiations with Andersons. He came into this state to finalize a business deal. Doing so, he submitted to the jurisdiction of courts in Ohio. *See Hammill Mfg. Co. v. Quality Rubber Prod., Inc.,* 82 Ohio App.3d 369, 374 (1992) (holding that a nonresident transacts business "within the plain and common meaning of the phrase" where defendant "initiates [the relationship], negotiates a contract, and through a course of dealing becomes obligated to make payments to an Ohio corporation"); *Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co. KG,* 196 Fed.Appx. 366, 369 (6th Cir.2006) (unpublished disposition) (noting that the statute's use of

6

the word "transaction" includes the "carrying on or prosecution of business negotiations"); *see also Cole v. Mileti*, 133 F.3d 433, 435 (6th Cir.1998).

Demrex's reliance on  *Matrix Essentials, Inc. v. Harmon Stores, Inc.*, 205 F.Supp.2d 779, 785 (N.D.Ohio 2001) to contend that it did not "transact" business is unavailing. The negotiation in *Matrix Essentials* involved a settlement, not a contract. *Id.* ("Although the decision to enter into a settlement agreement rather than [sic] persist in litigation is arguably a business decision, Matrix must show that Harmon transacted business in Ohio in order to meet the requirements of the long arm statute.").

Courts also consider whether the parties contractually obligated themselves to one another. *See Highway Auto Sales, Inc. v. Auto-Konig of Scottsdate, Inc.*, 943 F.Supp. 825, 829 (N.D.Ohio 1996) (explaining that the phrase transacting business must "logically subsume the narrower act of contracting"); *Kentucky Oaks Mall*, *supra*, 53 Ohio St.3d at 76 (finding personal jurisdiction when the defendant, among other things, negotiated a lease by telephone with an Ohio-based limited partnership that created ongoing duties and obligations).

As party to the September 21 and October 5, 2007 contracts, Demrex and Portnoy created ongoing contractual responsibilities. Demrex has monetary and reporting obligations. Portnoy, due to his personal guarantee, has an ongoing relationship as a surety for the contract. As such, this is not a case that presents "a single, isolated transaction." *See Douglas v. Modern Aero, Inc.*, 954 F.Supp. 1206, 1213 (N.D.Ohio 1997).

Finally, because Andersons' claim is for breach of contract, the same contract from which the defendants' transactions in Ohio arise, the statutory requirement that the suit stem from the "transaction" is satisfied. *See Tharo Systems*, *supra*, 196 Fed.Appx. at 369.

7

By initiating business negotiations, negotiating and executing a contract with an Ohio business with ongoing responsibilities, Demrex "transacted business" in Ohio pursuant to the Ohio long-arm statute.

## B. Constitutional Due Process

A defendant must have sufficient minimum contacts with the forum state such that maintenance of the suit will not offend traditional notions of fair play and substantial justice. *Hunter v. Mendoza*, 197 F.Supp.2d 964, 967 (N.D.Ohio 2002) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Sixth Circuit has articulated a three-part test to determine the constitutional validity of a grant of personal jurisdiction. *Cole*, *supra*, 133 F.3d at 436. Under this test, the: 1) defendants must purposefully avail themselves of the privilege of acting or causing a consequence in the forum state; 2) cause of action must arise from the defendants' activities with the forum state; and 3) defendants' acts, or consequences thereof, must have a substantial enough connection with the forum state to make the exercise over the defendant reasonable. *Welsh*, *supra*, 631 at 440; *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir.1968).

Based on the reasons below, I find that exercising personal jurisdiction over Demrex and Portnoy comports with due process.

### 1. Purposeful Availment

By requiring a defendant to purposefully avail himself to the laws of the forum state, courts ensure that a defendant is not haled into a jurisdiction based on a random, fortuitous or attenuated contact. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984). A defendant satisfies the purposeful availment requirement when his contacts create a "substantial connection" with the

forum state such that defendant "should reasonably anticipate" being sued there. *CompuServe, Inc., supra*, 89 F.3d at 1263.

Although entering into a contract with a resident of the forum state, without more, does not "automatically establish sufficient minimum contacts," *Highway Auto Sales Inc., supra*, 943 F.Supp. at 830, such contacts can come about through "prior negotiations, future consequences, and the terms of the contract." *Special Aviation Sys., Inc. v. Aircraft Structures Int'l Corp.*, 323 F.Supp.2d 839, 845 (N.D.Ohio 2004). Another relevant factor is whether the nonresident party "reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state." *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir.1989).

In *Burger King Corp.,* 471 U.S. 462, 475-476 (1985) (internal citations omitted), the Supreme Court offered the following explanation

> where the defendant deliberately has engaged in significant activities within a state or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

In *Cole, supra*, 133 F.3d at 436, the Sixth Circuit affirmed the lower court's decision, holding that Mileti, the nonresident defendant, purposefully availed himself of the laws of Ohio. Mileti, a resident of California, co-produced a motion picture and organized a corporation to purchase and distribute his film. *Id.* at 435. Cole, a resident of Ohio, invested in Mileti's corporation and secured a loan from a bank to do so. *Id.* After Mileti's motion picture failed at the box office, he started to negotiate with Cole, via telephone and letter, to buy his share of the corporation. *Id.* The parties executed a contract requiring Mileti to repay the bank in exchange for Cole's share in the

9

corporation. *Id.* Cole's widow brought suit alleging that Mileti breached this contract by failing to repay the bank – and the Ohio court found that it had personal jurisdiction. *Id.*

The court's decision in *Cole* is largely analogous to the one at hand. Like the nonresident defendant in *Cole*, Demrex and Portnoy negotiated via telephone and [electronic] letter with an Ohio-based corporation. In fact, Demrex and Portnoy went even further by traveling to Ohio to conduct negotiations in person. The parties executed a contract which required Demrex and Portnoy to provide future payments, just as the defendant did in *Cole.* Here, the contract also required Demrex to engage in reporting requirements. Portnoy provided an Ohio-based business with his personal financial information, an act that likely alerted him to the possibility of a suit in Ohio if Demrex defaulted. Demrex, further, initiated its business relationship with Andersons – a factor that the court in *Cole* did not assess. Demrex and Portnoy reached past the Pennsylvania border to create a business relationship with an Ohio-based corporation. *See LAK, Inc., supra*, 885 F.2d at 1300.

Demrex and Portnoy claim, erroneously, that their actions were random and fortuitous. They intentionally entered into the State of Ohio to meet with Shah, as evidenced by Portnoy's September 18, 2007 email. I am not persuaded that Demrex and Portnoy intended for this meeting to be solely a "meet-and-greet" given the number of sensitive contractual issues ripe for negotiation. Even if it was, however, defendants' relationship with Ohio would not qualify as a random or fortuitous meeting, due to the number of telephonic and electronic communications between the parties. *See Cole, supra*, 133 F.3d at 436 (finding that defendant purposefully availed himself despite never traveling to Ohio).

Demrex and Portnoy assert that the facts in *Calphalon Corporation v. Rowlette*, 228 F.3d 718 (6th Cir.2000) more closely resemble this case.  In *Calphalon*, an Ohio-based manufacturer plaintiff

10

and Minnesota-based corporation defendant executed an  agreement in which the defendant agreed to promote the plaintiff's products, keep plaintiff informed of market conditions and develop sales plans for customers. *Id.* at 720-21. The Sixth Circuit found that the nonresident defendant did not purposefully avail himself of the privilege of acting in the forum state, despite his entering into a contract with an Ohio-based corporation, telephone and email contact. *Id*. at 723. It noted that the defendants' physical visits to Ohio occurred because plaintiff "chose to be headquartered in Ohio, not because Rowlette sought to further its business and create continuous and substantial consequences there." *Id*. (internal citations omitted). Notably, the defendants visited Ohio for a mandatory sales meeting and to accompany a client, not to engage in business negotiations. *Id*. at 720.

Both *Cole* and *Calphalon* share factual similarities with the instant case, but represent different outcomes. Because the facts in *Cole*, however, are more closely analogous to the case at hand, I will follow its reasoning.

### 2. Claim Arises Out of Defendants' Activities With The Forum State

Plaintiff's claim must arise out of defendants' activities in the forum state to comport with due process. *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1116-17 (6th Cir.1994). To meet this requirement, defendants' contacts with the forum state must relate to the operative facts of the controversy. *Id*. "[I]f the cause of action is for breach of that contract, as it is here, then the cause of action naturally arises from the defendant's activities in Ohio." *Cole, supra*, 133 F.3d at 436.

11

Here, defendants solicited, negotiated and executed a business contract with an Ohio-based corporation, the same contract on which Andersons base its breach of contract claim. Thus, the defendants' contacts in Ohio relate to this controversy's operative facts.

### 3. Reasonableness of the Exercise of Personal Jurisdiction

This final prong ensures that the assertion of jurisdiction is fair and reasonable. If a court finds the first two elements – purposeful availment and a cause of action arising from the defendants' contacts with Ohio – then an inference arises that the third element is also established. *Cole*, *supra*, 133 F.3d at 436 ("[W]hen we find that a defendant like Mileti purposefully availed himself of the forum and that the cause of action arose directly from that contact, we presume the specific assertion of personal jurisdiction was proper."); *Southern Machine Co.*, *supra*, 401 F.2d at 384.

Because defendants' arguments to the contrary do not overcome this inference, I conclude that asserting personal jurisdiction does not offend traditional notions of fair play and substantial justice. Demrex and Portnoy argue that due to their physical location in Pennsylvania, they would suffer an undue and excessive burden if forced to defend an action in Ohio. I disagree. Pennsylvania adjoins Ohio, which minimizes the burden of defending an out-of-state action. I also disagree with defendants' contention that Ohio lacks an interest in the resolution of this dispute. Ohio has an interest in resolving suits brought by one of its citizens and in seeing that its residents get the benefit of their bargains.

## CONCLUSION

For the foregoing reasons, it is hereby:

ORDERED THAT defendants' 12(b)(2) motion to dismiss for want of personal jurisdiction be, and the same hereby is denied.

A pretrial conference is scheduled for January 13, 2009 at 3:00p.m. Out of town counsel may participate by telephone.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge
